**David E. HOXENG, d/b/a ADX Communications, Plaintiff,**

v.

**TOPEKA BROADCOMM, INC., et al., Defendants.**

**Civil Action No. 94–2284–GLR.**

United States District Court, D. Kansas.

Jan. 12, 1996.

Timothy H. Girard, Grant M. Glenn, Bruce J. Woner, Woner, Glenn, Reeder, Lowry & Girard, Topeka, KS, for David E. Hoxeng.

Marta Fisher Linenberger, Arthur E. Palmer, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for Topeka Broadcomm, Inc.

Charles A. Getto, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for Recoll Management Corp.

Martha A. Peterson, Myron L. Listrom, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, for Twenty First Century Broadcasting, Inc., Marvin Wilson.

## MEMORANDUM AND ORDER

RUSHFELT, United States Magistrate Judge.

On June 20, 1995, this case came on for trial by jury. On July 3, 1995, the jury returned a verdict in favor of plaintiff upon his claim against defendant TBI for breach of contract and his claims against defendants Recoll and Dr. Wilson for tortious interference with his contract. By special verdict the jury found that plaintiff and defendant TBI "entered into an enforceable contract whereby plaintiff agreed to purchase and defendant (TBI) agreed to sell radio station KTPK–FM free and clear of liens and encumbrances." The jury further found that defendant Recoll "consented to the contract." The jury awarded plaintiff actual damages in the aggregate amount of $350,000, applicable to all three claims. The court reserved the issue of specific performance of the contract, pending the jury verdict.

The case now comes before the court to determine post-trial matters. As directed, the parties have submitted proposed findings of fact and conclusions of law upon the claim for specific performance. They have also filed post-trial motions: Plaintiff's Motion to Alter or Amend the Judgment (doc. 238); Defendant Marvin Wilson's Renewal of Rule 50 Motion and/or in the Alternative for Judgment Not Withstanding (sic) the Verdict (doc. 240); Motion for Judgment as a Matter of Law (doc. 242), filed by defendant TBI; Defendant Recoll Management Corporation's Motion for Judgment as a Matter of Law, Judgment Notwithstanding the Verdict and Renewed Motion for Summary Judgment (doc. 251). On November 28, 1995, the court entertained oral arguments upon these motions and the request for specific performance. It now makes the following findings and rulings:

## FACTS

This case involves the sale of a radio station in Topeka, Kansas. Plaintiff sued to enforce a written contract to buy Station KTPK–FM from its owner, Defendant Topeka Broadcomm, Inc. (TBI). TBI had bought the station in 1988 with proceeds of a loan from the Bank of New England in the amount of $2,262,000. It secured the loan with a first mortgage against the assets of the station. The station operated at a loss.

In 1990 defendant TBI engaged Blackburn & Co. (Blackburn) (a non-party) as broker to sell the station for $2,500,000. Its efforts to sell it at this price proved unsuccessful. In 1991 the New Connecticut Bank and Trust Co., successor to the Bank of New England, gave notice of default of the loan. The Federal Deposit Insurance Company (FDIC) as receiver took control of the assets of the bank. To manage liquidation of the loan and other receivables of the bank, the FDIC retained the co-defendant RECOLL Management Corp. (Recoll) as its agent and attorney in fact. On May 14, 1992, defendants TBI and Recoll and another creditor of the station entered into an agreement for TBI to continue to try to sell the station. It agreed to recover as much as possible to satisfy the outstanding indebtedness.

On November 10, 1992, defendant TBI and its broker Blackburn entered into a new agreement. It provided that Blackburn would try to sell the station for $2,000,000. A sale for this price would require the approval of Recoll as attorney in fact for the FDIC, in order to convey the assets free and clear of the lien of its mortgage. In June or July 1993 Anthony Rizzo on behalf of Blackburn told Sue Myskowski, loan officer for Recoll, that the station would probably not sell for $2,000,000. Upon his suggestion she obtained the approval of the Recoll Special Assets Committee for sale of the station for the highest offer above $1,250,000.

In previous efforts to buy a radio station, plaintiff had been in communication with Blackburn. In early 1993 he learned from Rizzo that Station KTPK–FM was for sale. After rejection of one proposal to buy it for a lesser price, plaintiff David E. Hoxeng d/b/a ADX Communications (Hoxeng) on July 30, 1993, submitted to Rizzo a written, signed Letter of Intent. It proposed that TBI sell him the station for $1,500,000. Rizzo determined through Sue Myskowski that the FDIC and Recoll approved the proposed sale for $1,500,000.

Rizzo reported these developments to the plaintiff. Viewing his letter not as an offer to buy, but simply an invitation for TBI to

offer to sell the station to him for $1,500,000, plaintiff sought assurance that TBI as owner and seller, in addition to Recoll for the lien-holder, agreed to the sale as he had proposed. Upon the request of Rizzo and Recoll, therefore, Pierce McNally, president of TBI, sent Rizzo two letters, dated respectively August 16 and 18, 1993. They expressed the desire of TBI to proceed with the potential sale of the station to plaintiff. The letter of August 18 included a signature line for Recoll. Rizzo sent copies of these letters to plaintiff.

Plaintiff told Rizzo this was not enough to assure him TBI was itself agreeing to his proposal of July 30, 1993. He also told Rizzo he would proceed no further and would not travel to Topeka to perform a "due diligence" inspection of the station, until he had additional assurance from TBI of its commitment to the proposed sale and to transfer to him its radio license and other assets free of liens. With the urging of Recoll, Rizzo requested McNally for TBI to provide such additional assurance to plaintiff.

McNally responded on August 19, 1993, by adding some text to his letter of the previous day. He specifically noted the following text of his original letter: "It is my understanding that the proposed purchase price of $1,500,000 is acceptable to RECOLL and upon satisfactory completion of the acquisition by ADX, any and all security agreements in RECOLL'S favor will be released." McNally signed and added to this the following handwritten, marginal text: "Topeka Broadcomm, Inc. is willing to accept the proposal set forth by the potential buyer as discussed herein and assign the broadcast license to the potential buyer at closing subject to (illegible)." After further oral communication with Rizzo and Myskowski, plaintiff concluded that he had an enforceable contract with TBI and the necessary approval of Recoll, notwithstanding the absence of its signature.

At some time during the period August 16 through 23, 1993, defendant Marvin Wilson, M.D. (Wilson), a former part owner of the station, contacted Recoll to determine if it was still for sale. Recoll said yes. It encouraged him to submit a bid.

On August 24, 1993, for himself and a group of fellow investors, Wilson submitted an offer to buy the station for $1,550,000. In September he increased the offer to $1,650,-000. TBI and Recoll accepted this final offer by Wilson. They thus agreed to sell the station to his designee, the co-defendant Twenty–First Century Broadcasting, Inc. (Twenty–First Century). Defendants have deferred the final performance of that agreement, pending resolution of this law suit.

In this action plaintiff has asked the court to decree specific performance of his contract with defendant TBI. In the alternative he has sought damages against TBI for breach of contract. He has also asserted claims for damages against the co-defendants Recoll and Wilson for tortiously interfering with his contract with TBI. Plaintiff joined Twenty–First Century as a defendant, to terminate any right it might have to buy the radio station against a decree of specific performance of his contract.

## WHETHER OR NOT A CONTRACT EXISTED

By their respective motions all defendants have challenged the sufficiency of the evidence to justify the verdict and special findings by the jury that a valid contract existed between plaintiff and defendant TBI and that Recoll consented to it. The court finds this issue basic to all others which the parties have asserted. Accordingly, it will address it first.

Defendants assert several reasons to support their contention that the evidence fails to show an enforceable contract between plaintiff and defendant TBI. First they contend that the contract must fail, because co-defendant Recoll never signed it. They suggest that the addition of a signature line for Recoll created a condition precedent to the formation of any contract between plaintiff as buyer and TBI as seller. The court must decide the issue, of course, by determining whether substantial evidence exists upon which the jury could find as it did. In making that determination, the court notes what inferences may reasonably be drawn from the evidence.

Reduced to its basic elements, the contract consisted essentially of an offer and acceptance of the proposition that defendant TBI sell and plaintiff buy the station for $1,500,-000 cash, free and clear of liens. Plaintiff insists he was the offeree, not the offeror in this transaction. Regardless of who was offeror and offeree, the parties reached a meeting of the minds on these basic elements. This justifies an assumption that they agreed upon the essential elements of an enforceable contract.

Notwithstanding this initial assumption, the court must consider whether other provisions of the agreement defeat a finding that an enforceable contract existed. For this reason it must determine whether or not the evidence requires finding that the additional signature of Recoll was a condition precedent to an enforceable contract. Defendants contend McNally made the Recoll signature a condition precedent. All parties agree that the consent of Recoll to the contract was necessary. They disagree, however, as to whether its signature upon McNally's letter of August 18 was prerequisite to an enforceable agreement.

The court finds adequate evidence to sustain the jury finding that an enforceable contract existed, notwithstanding the absence of the Recoll signature. First, as a basic premise a contract for the sale of something requires the agreement of both seller and buyer. To effect a sale free of liens, of course, may require the approval of the lienholder, if the sale will affect its rights.

The court knows of no principle of contract law, however, and defendants have cited none, requiring a lienholder to sign a contract of sale. A lienholder may consent in any number of ways, verbally, in writing, or by other conduct. The court finds in this case no evidence of any business custom or practice for a lienholder to sign a contract of sale.

In this case, of course, McNally obviously intended the lienholder either to sign the contract or, if not, to have the opportunity to do so. The court can ascribe no other intent to the addition of a signature line for Recoll. The court must determine, therefore, whether the evidence permits finding that TBI was simply seeking to confirm the consent of Recoll, either by signature or otherwise, or whether the signing itself was an absolute condition precedent to an enforceable contract. The text of the document, prepared by McNally, provides no explanation as to what if any materiality the presence or absence of the signature should have.

The evidence at trial suggests a strong motivation on the part of defendant TBI to accomplish a sale with the consent of Recoll, however, with or without its signature. As an absentee owner, TBI had operated the facility with the same personnel who had managed it before its acquisition. The station had operated for several years at a loss. TBI faced default on its loans, secured by the assets of KTPK–FM. It hoped to liquidate the loans. Through its broker Blackburn it had sought unsuccessfully for almost three years to sell the station. To encourage potential buyers, TBI and Recoll substantially reduced their original asking price. In the summer of 1993 Anthony Rizzo of Blackburn suggested a further reduction to $1,500,000, after an offer of $1,200,000 from plaintiff had been rejected in May. At this point TBI was deferring to Recoll the decision as to purchase price and terms of payment or financing.

On July 30, 1993, plaintiff communicated to Anthony Rizzo of Blackburn his proposal to buy the station for $1,500,000 cash. Both TBI and Recoll responded with enthusiasm. No other potential buyer had shown interest, at least to the extent of making an offer. On August 5, 1993, as broker for TBI, Rizzo told plaintiff, "It's a done deal," and that his proposal was acceptable to Recoll. After plaintiff requested assurance that TBI as owner also agreed to the proposal, McNally wrote his letter to Rizzo on August 18, 1993. Its text included the following: "It is my understanding that the proposed purchase price of $1,500,00 is acceptable to Recoll and upon satisfactory completion of the acquisition by ADX, any and all security agreements in Recoll's favor will be released." It included a signature line for Recoll. McNally himself sent a copy of this letter to plaintiff. After plaintiff requested additional assurance from TBI, McNally added the mar-

ginal text, confirming its agreement to the terms of purchase. He then signed this marginal addition on behalf of TBI.

Recoll also pursued the proposed sale with enthusiasm. Its Special Assets Committee had previously approved in principle a sale for the highest offer above $1,250,000. In early August Sue Myskowski had told Rizzo of her discussion about the matter with her supervisor Mike Scinto and that Recoll would accept $1,500,000 cash. On August 4, 1993, Rizzo transmitted to Myskowski a copy of the proposal by plaintiff to purchase the station for $1,500,000. She replied, "This is what Recoll wants. We have a deal." When plaintiff told Myskowski on August 19, 1993, that he wanted further assurance from McNally that TBI had agreed to his proposal, she said she would obtain that assurance from McNally. Plaintiff told her he would not otherwise go to Topeka to perform his "due diligence" inspection of the station. On August 19, 1993, plaintiff later received confirmation from Myskowski or her office that it had received the necessary assurance from McNally that TBI agreed to the deal.

After receiving these assurances from both McNally and Rizzo on behalf of TBI and from Myskowski on behalf of Recoll, plaintiff traveled from his home in Texas to Topeka, Kansas, and performed his "due diligence." He had previously transmitted to Rizzo his deposit of $25,000 against the purchase price. McNally, Rizzo, and Myskowski traveled respectively from Minnesota, Virginia, and Connecticut to join plaintiff in Topeka for his "due diligence" exercises. Nothing happened, either in conversation or otherwise, to suggest that the agreement was merely tentative or not binding.

Other circumstances suggest that the signature of Recoll was a dispensable feature, not a condition precedent to the contract. Aside McNally, no one had ever suggested Recoll itself must sign a contract of sale of the station. Nothing in the contract itself, including the text added by McNally, suggested the signature to be prerequisite to enforceability. If it was to have that importance, McNally could easily have indicated it with brief, additional language like, "This agreement shall not take effect until Recoll

has executed it below" or "The signature of Recoll below is a condition precedent to this becoming an enforceable contract." Nothing in the evidence suggests that McNally ever made any further inquiry or even expressed any further interest as to whether Recoll had in fact signed the proposal. The evidence fails to show any subsequent conduct of either TBI or Recoll to suggest the signature of Recoll was itself vital to the contract. Only after they received a higher offer from defendant Wilson a few days later did defendants begin to make that contention.

Defendants also contend a contract failed to come into existence, because plaintiff and TBI did not reach a meeting of the minds upon a number of important terms and conditions. They argue that plaintiff's letter of intent of July 30, 1993, was simply a preliminary proposal, an agreement to agree. Its text begins with the words, "Subject to agreement on and the execution of a formal contract...." Paragraph 2 of the letter contemplated that, "An inventory of the assets to be delivered will be prepared and will become part of the formal contract." Paragraph 8 of the letter further provided as follows:

8. The Seller shall have a period of 10 business days after execution by both parties of this Letter of Intent to provide Buyer and its agents access to complete a preliminary due diligence examination of all: legal documentation, financial documentation, technical information and facilities. If Buyer is for any reason in its sole determination not satisfied with its preliminary examination (which will be completed within 21 business days after Seller provides all such access), the Buyer shall then have no further obligation whatsoever to Seller and this Letter of Intent shall be deemed terminated.

In addition to the foregoing features, the letter also provided that, "This offer ... shall expire 5 business days from the above date," i.e. five days from July 30, 1993.

Defendants further argue that two other items were prerequisite to a meeting of the minds for an enforceable contract. First, in his letter of August 18, 1993, to Tony Rizzo of Blackburn, the copy of which was later

sent with its handwritten marginal addition to plaintiff, Pierce McNally asserted the inability of TBI "to give without RECOLL the financial representations and warranties." Second, he also included the following paragraph in his letter:

As further comfort to your client, the May 14, 1992 agreement between RECOLL, Topeka BroadComm, Inc. and the latter's principals provides for the orderly operation of KTPK–FM pending its sale and requires exculpatory language in any definitive agreement for purchase and sale as to Topeka BroadComm, Inc. and its principals.

Defendants thus argue that the requirement for exculpatory language in a final agreement precludes creation of a contract simply by the letters of the parties and the performance of due diligence.

To the contrary, of course, plaintiff argues that a contract came into existence, as follows: He sent to the broker his Letter of Intent of July 30, 1993, as a solicitation for TBI to offer to sell him the station for $1,500,000. Defendant Recoll as lien-holder orally agreed to the purchase price. TBI then agreed to sell the station to plaintiff for $1,500,000 by virtue of its letter of August 18 and the handwritten marginal text which McNally added on August 19, 1993. It sent a copy of this letter with the added text to plaintiff. He orally confirmed or re-confirmed to Rizzo of Blackburn and to Myskowski of Recoll his agreement to the contract. Plaintiff then commenced his performance of the contract by traveling from Dallas to Topeka and engaging in due diligence at the location the station.

■ Jurisdiction in this case rests upon diversity of citizenship of the parties. Accordingly, the substantive law of the state determines whether or not a contract came into existence in this case. Plaintiff has urged the court to apply the law of Texas, defendants the law of Kansas. The court has found the law of Kansas applicable. Plaintiff has neither demonstrated nor persuasively argued why the law of Texas should control. Under his theory of the contract he was in Texas when he orally communicated to Rizzo and Myskowski in Connecticut or Virginia his

acceptance of the offer of plaintiff to sell the station. The court finds nothing of record to suggest anyone had proposed telephone as the medium for communicating consent to a contract. Plaintiff argues, moreover, that his acceptance of the contract included his performing due diligence at Topeka. The remaining performance of the contract, including conveyance of the assets of the radio station, the release of liens, and probably the closing of the sale would also occur in Kansas, where counsel for plaintiff and defendant TBI are located.

■ With respect to the relationship between an informal agreement and a more formal, subsequently written contract, Kansas case law provides several underlying principles:

It is elemental that in order for parties to form a binding contract, there must be a meeting of the minds as to all essential terms thereof (*Topeka Savings Association v. Beck,* 199 Kan. 272, 428 P.2d 779). Moreover ... an agreement to make a contract in the future is not binding unless all the terms and conditions are agreed upon and nothing is left to future negotiation. (*Railroad Co. v. Gorman,* 79 Kan. 643, 100 Pac. 647).

*Weil & Assocs. v. Urban Renewal Agency,* 206 Kan. 405, 414, 479 P.2d 875 (1971).

■ Several additional principles address transactions which involve an informal agreement to be followed by a more formal, written contract:

Whether parties to an informal agreement became bound prior to the drafting and execution of a contemplated formal writing is largely a question of intent on their part. The intent of the parties is to be determined by the surrounding facts and circumstance of each case. (Citations omitted.)

This court has held that the mere intention to reduce an informal agreement to a formal writing is not of itself sufficient to show that the parties intended that until the formal writing was executed the informal agreement should be without binding force. (Citations omitted.)

However, the fact that the parties contemplate the execution of a formal document is some evidence, not in itself conclusive, that they intend not to be bound until it is executed. And where formal contracts are normally executed because of the complexity and importance of the transaction involved the more likely it is that the informal agreement is intended to be only preliminary. (1 Corbin on Contracts [1963], sec. 30, p. 97.)

The subsequent conduct and interpretation of the parties themselves may be decisive of the question of whether a contract has been made even though a document was contemplated and has never been executed. . . .

But where the intent of the parties is clear that they are negotiating with an understanding that the terms of the contract are not fully agreed upon and a written formal agreement is contemplated a binding contract does not come into existence in the absence of execution of the formal document. (*Weil & Associates v. Urban Renewal Agency,* 206 Kan. 405, 479 P.2d 875.)

*King v. Wenger,* 219 Kan. 668, 671–72, 549 P.2d 986 (1976).

█ Sufficient evidence exists to support the finding that plaintiff and TBI reached an agreement upon the essential terms of a contract. They both agreed to a sale of KTPK–FM radio station by TBI to plaintiff for $1,500,000 cash, free and clear of liens (with the approval of the lienholder Recoll). That sufficed, without more. The analysis, however, does not stop at that point. To determine whether the evidence, considered as a whole, supports the finding of a contract requires evaluation of the importance of the additional provisions in the letters. As previously noted, "The intent of the parties is to be determined by the surrounding facts and circumstances of each case." *Id.* at 671, 549 P.2d 986. For this determination the court analyzes the relevant evidence as follows:

1. As already noted, plaintiff and defendants TBI and Recoll all displayed initial enthusiasm and eagerness to proceed with the sale of the station to plaintiff, pursuant to their respective letters of intent and response, as if they indeed had mutually agreed to the sale. After receiving a copy of the plaintiff's proposal, Sue Myskowski for Recoll said, "This is what Recoll wants. We have a deal." Recoll had already reduced its minimum acceptable price to the highest offer above $1,250,000. When plaintiff initially hesitated, unsure if the seller had agreed, Recoll urged TBI to immediately provide the him with the necessary assurance. At that point Recoll expressed no concerns about contingencies or conditions other than a sale for $1,500,000 cash—something it had not seen despite months of efforts to sell.

Pierce McNally also showed eagerness to proceed with the sale, as proposed. His letter of August 18, 1993, among other things states, "I want to proceed with the ADX request on the due diligence front and to assure Mr. Hoxeng of KTPK's co-operation in every aspect of that exercise. . . . It is my understanding that the proposed purchase price of $1,500,000 is acceptable to RECOLL and upon satisfactory completion of the acquisition by ADX, any and all security agreements in RECOLL's favor will be released." On August 19, 1993, McNally sent to plaintiff by FAX a copy of this letter with its handwritten, marginal addition, providing the additional assurance of agreement which plaintiff had sought. All of this mutual enthusiasm to complete the sale to plaintiff continued unabated, without hesitation or further qualification, until Recoll suddenly received news of a prospectively higher offer from someone else—defendant Marvin Wilson. Only at that point did defendants begin to suggest they did not already have a contract.

2. After exchanging their respective letters, plaintiff and defendant TBI immediately began to perform their agreement. Plaintiff had already tendered a deposit of $25,000. From their several locations across the country the parties converged upon Topeka for the exercise of due diligence by the plaintiff. There came Mr. Hoxeng, McNally for TBI, Myskowski for Recoll, Rizzo from the broker Blackburn. They met. They talked. They discussed the station. They met with its management. Hoxeng expressed approval for what he found. The parties parted, ap-

parently satisfied to proceed further. No one suggested there was not yet a contract.

The evidence compels no finding that the parties were simply contemplating sale to plaintiff as a mere possibility, dependent upon the occurrence of other conditions. Despite their apparent eagerness to proceed, their immediate convergence in Topeka, and their discussions there about the sale, the evidence lacks any suggestion that they talked about the matters which defendants now deem to have been of such great consequence, i.e. the need for a formal, written contract, the mandate for a written signature by Recoll, or a need for further assurance that Hoxeng was satisfied with the results of his due diligence. At the end of their meeting in Topeka all parties were conducting themselves as if performing a contract to which they had already agreed.

3. The evidence does not clearly indicate whether or not formal contracts are normally executed for the sale of a radio station because of some complexity or importance of the transaction and a greater likelihood that an informal agreement is intended to be only preliminary. From the evidence the jury would have had to speculate those possibilities as facts. The court will not speculate on the point. The evidence lacks any indication of a business custom or practice to require a formal, written contract for sale and purchase of radio stations. The court declines to find such custom or practice, moreover, merely from the apparent contemplation of such a contract in connection with the now proposed sale of KTPK–FM to defendant Twenty–First Century.

4. Besides the lack of showing any custom or practice to require a more formal, written contract, one might reasonably infer from the evidence that no such requirement exists. Tony Rizzo had years of experience in the sale and purchase of radio stations throughout the United States. Rizzo testified to nothing, however, suggesting any such custom or practice. To the contrary, he testified that many deals occur merely upon a handshake and without any signing of a document.

5. Testimony by Anthony Rizzo, furthermore, tends to strengthen the finding of an enforceable contract. As broker, Rizzo had served as intermediary for the parties. He reviewed and transmitted their various communications to one another—TBI, Recoll, and plaintiff. These included the letters of July 30 and August 18 and the handwritten addition of August 19. He knew their contents, e.g., the proposals for a more formal, written contract, exculpatory language, and a signature line for Recoll. He had engaged in extensive conversations with McNally, plaintiff, and Myskowski. In the middle of this activity Rizzo knew better than any other witness the relative positions of the parties and how they were responding to one another with respect to the proposed sale. Yet Rizzo testified that he thought KTPK–FM was off the market and that plaintiff and defendant TBI had a "deal." This statement, of course, constitutes a conclusion about an ultimate fact; but it nevertheless weighs to support the jury finding of a contract. After his years of experience in the sale and purchase of radio stations, Rizzo apparently saw nothing either in the letters or otherwise in the conduct of the parties to dissuade him from proceeding as though an enforceable contract existed. The jury at least could reasonably draw these inferences from his testimony.

6. The record lacks any significant evidence to suggest that any party regarded the additional provisions to be of such consequence as to preclude a contract from coming into existence without their first being resolved or further addressed. This includes the proposal for a formal, written contract, the signature line for Recoll, the ability of plaintiff to determine whether or not to proceed further after performing his due diligence, the requirement for exculpatory language, and the prospective date of expiration. Neither McNally, Rizzo, Myskowski, Scinto, nor any other witness, provided any significant evidence to show whether these matters were on the one hand critical or on the other hand dispensable or simply incidental and not impairments to an enforceable contract. The jury could reasonably infer from this lack of explanation that these matters, although not yet resolved, were simply second-

ary and did not impair the formation of a contract.

7. When Recoll informed TBI of its intent to approve the bid of defendant Wilson, rather than the proposal of Hoxeng, McNally's reaction indicates a recognition that plaintiff might indeed have a claim for a breach of contract. McNally requested that Recoll agree to indemnify TBI against any resulting claim from plaintiff.

From the total record, the court thus concludes that substantial evidence exists from which a jury could reasonably find that plaintiff and defendant TBI entered into an enforceable contract. As stated in *King, supra,* the fact that the parties contemplated execution of a formal document is some evidence, but not in itself conclusive, that they intended not to be bound until it is executed. As further noted in *King,* however, the subsequent conduct and interpretation of the parties themselves may be decisive of the question of whether a contract has been made even though a document was contemplated and never executed. In this case the jury could reasonably find from the subsequent conduct and interpretation of the parties themselves that a contract was made.

### THE CLAIM FOR SPECIFIC PERFORMANCE OF THE CONTRACT

 The court next addresses the request of plaintiff to decree specific performance of his contract. Such a decree would require defendants to sell station KTPK–FM to him according to the terms of the contract free and clear of encumbrances. All defendants oppose this request.

The court must first determine an issue of jurisdiction to order specific performance in this case. Defendant Recoll contends such jurisdiction does not exist. It first cites several sections of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA). Sections 1811 through 1833e of Title 12 of the United States Code contains the provisions relevant here. Section 1821 of this statute governs the conservatorship and receivership of the Federal Deposit Insurance Corporation (FDIC). Subsection 1821(d)(2)(G)(i)(II) provides as follows:

**(I) In general**

The Corporation may, as conservator or receiver—

. . . . .

**(II)** subject to clause (ii), transfer any asset or liability of the institution in default (including assets and liabilities associated with any trust business) without any approval, assignment, or consent with respect to such transfer.

Section 1821 further provides:

**(j) Limitation on court action**

Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver.

In this case the FDIC as receiver for the New Connecticut Bank and Trust Co. transferred to defendant Recoll for collection and recovery the outstanding loan and first mortgage against the assets of KTPK–FM. Recoll contends that the above-cited sections preclude the court from ordering specific performance. It further argues that the statute deprives the court of jurisdiction to enter a decree of specific performance. Plaintiff opposes these arguments. Upon grounds of untimeliness he also asks the court to decline any consideration of three cases cited and submitted by defendant Recoll at the hearing of November 21.

The court agrees that defendant Recoll should have submitted as part of its briefing upon proposed findings of fact and conclusions of law the three cases cited at the hearing. Their late submission does not preclude their use, however, either by the court or by the parties. They address jurisdiction of the court to grant a type of relief. The court must always consider that kind of jurisdictional issue, regardless of how or when raised. In this instance the court gave counsel adequate opportunity to submit additional memoranda in response to the citations. Plaintiff has filed a memorandum. He thereby challenges applicability of the cited cases.

Whether or not the statute prohibits specific performance against defendant Recoll raises two subsidiary questions. First, the court must determine whether specific per-

formance would "restrain or affect the exercise of powers or functions of the Corporation (here the FDIC) as a conservator or a receiver," as prohibited by 12 U.S.C. § 1821(j). Plaintiff argues that specific performance would have no such effect. He offers no authority for this conclusion. The cases cited by defendant indicate otherwise. They reflect a broad interpretation of the statute to enable the FDIC to fulfill a duty to conserve, liquidate, and realize maximum recovery of assets for the benefit of creditors and depositors of failed financial institutions.

In the present case the sale of KTPK–FM will serve to liquidate and recover indebtedness owed by defendant TBI to the bank for which the FDIC is receiver. The assets of KTPK–FM constitute security for the debt. To order specific performance of any particular sale of the security over the opposition of the FDIC would most certainly affect the exercise of its powers and functions as receiver to liquidate the debt and to dispose of the assets upon the best terms possible for the benefit of the creditors and customers of the bank. In this case specific performance not only would mandate a sale to plaintiff, moreover, but also would operate indirectly to enjoin the proposed sale to the defendant Twenty–First Century. The latter sale also involves exercise of the powers and functions of the FDIC to realize maximum recovery upon the unpaid balance of the loan it holds as receiver.

Several cases cited by defendant support the application of these principles. They affirm the breadth of statutory authority and discretion given the FDIC to deal with assets in receivership and, conversely, the clear restriction against the use of judicial power to restrain it from exercising discretion to carry out that function.

In *Gosnell v. FDIC*, 938 F.2d 372 (2d Cir.1991) a disappointed high bidder for the assets of a failed bank sought to enjoin the FDIC from selling them to another buyer. The Second Circuit affirmed the trial court in denying the injunction:

> [W]ere we to allow disappointed bidders such as Gosnell to challenge the manner in which the FDIC chooses to dispose of its assets, we would undermine Congress' in-

tent to allow the FDIC broad discretion in the disposition of its assets.

938 F.2d at 376.

In *Pyramid Constr. Co. v. Wind River Petroleum, Inc.*, 866 F.Supp. 513 (D.Utah 1994) plaintiff as assignee of the successful bidder for purchase of real estate from the Resolution Trust Corporation sought to rescind a sale of the property to another buyer. Applying 12 U.S.C. § 1821(j), the court sustained the motion of the actual buyer to dismiss the case. It ruled as follows:

> The dispositive issue to be decided here is whether the anti-injunction provision of the Financial Institutions Reform, Recovery, and Enforcement Act, 12 U.S.C.A. sec. 182(j), deprives this court of jurisdiction to grant the type of relief requested in Pyramid's fifth cause of action. For the reasons discussed below, the court finds that such jurisdiction is indeed lacking, and accordingly grants Wind River's motion to dismiss Pyramid's fifth claim for relief.
>
> When Congress enacts a statute prohibiting a federal court from granting a certain type of remedy, that limitation is jurisdictional. See *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 522, 101 S.Ct. 1221, 1234, 67 L.Ed.2d 464 (1981).... In this case, Wind River claims that the equitable relief Pyramid seeks in its fifth cause of action has been prohibited by Congress pursuant to 12 U.S.C.A. sec. 1821(j), and that this court therefore lacks jurisdiction to entertain it under the authority cited above....
>
> Clearly, the disposition of a failed thrift's assets, like the RTC's sale of the Snow Creek Parcel to Wind River in this case, is one of the quintessential statutory powers of the RTC as a receiver.... Equally clear is that section 1821(j) prohibits a federal court from granting a party any sort of equitable relief that would directly "restrain or affect" the RTC in carrying out its statutory powers....

866 F.Supp. at 517 (footnote omitted).

■■■ Concluding that the remedy of specific performance is not available to plaintiff against the FDIC, the Court must further determine whether defendant Recoll as its

agent and attorney in fact may assert the prohibition of § 1821(j). The court holds that Recoll may do so. *Pyramid, supra,* addresses that issue. Plaintiff there contended that its request for equitable relief against the actual buyer did not affect the statutory power or function of the Reconstruction Trust Corporation; because it had already sold the property and had no remaining interest in it. The court rejected this argument:

> The court must reject Pyramid's narrow interpretation of section 1821(j), for several reasons. First, the plain language of the statute does not allow for such a limited reading. It provides that "no court may take any action ... to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver." ... Such broad and all-encompassing language evidence, in the court's view, an intent by Congress to prohibit any interference with the RTC as a receiver—either directly or indirectly. Thus, to the extent that Pyramid attempts to confine section 1821(j)'s reach to only those cases where the RTC is directly interfered with, that attempt must be rejected as inconsistent with the statute itself. See *Volges v. Resolution Trust Corp.,* 32 F.3d 50, 52 (2d Cir.1994) (refusing to narrow section 1821(j)'s reach in light of the statute's broad and unequivocal language).

> Second, Pyramid's narrow reading of section 1821(j) is controverted by the many federal courts around the United States which have also interpreted the statute.... In this case, the RTC has already sold the Snow Creek Parcel to Wind River and Pyramid's fifth claim for relief would now rescind that deal in its entirety and order Wind River to sell the property to Pyramid. Such relief would undoubtedly "restrain or affect" the RTC in the performance of its statutory duties just as surely as the cases mentioned above. Accordingly, this court is without power to order such a transaction.

> Finally, to read section 1821(j) as narrowly as Pyramid suggests would violate the clear intent of Congress in enacting the statute. As is abundantly clear from its legislative history, section 1821(j) is

> "but part of a broader scheme enacted to allow the RTC expeditiously to wind up the affairs of defunct savings and loan institutions without judicial interference."

866 F.Supp. at 518, 519. The foregoing interpretation of § 1821(j) applies to the FDIC as much as it does to the RTC.

In *Homeland Stores, Inc. v. RTC,* No. 91–1304–K, 1992 WL 319659 (D.Kan. Oct. 13, 1992), *aff'd,* 17 F.3d 1269 (10th Cir.1994), District Judge Kelly of this Court similarly noted the broad reach of 12 U.S.C. § 1821. Plaintiff there sought an injunction against Bob's Super Saver, Inc. (Bob's), to avoid a lease it had obtained from the RTC. The court held plaintiff had failed upon its claim for breach of contract and, therefore, could not obtain injunctive relief. It noted, nevertheless, that the statute would bar such relief against Bob's, had plaintiff shown a breach:

> Assuming a claim could be made and that plaintiff moves for relief, plaintiff argues that Bob's is a private party and therefore not protected by 12 U.S.C. sec. 1821. Thus, injunctive relief is possible. RTC, however, claims that enjoining Bob's is an indirect way to avoid the statute and enjoin RTC.

> The statute states that the court may not take "any action" to restrain the receiver in its functions or powers. 12 U.S.C. sec. 1821(j). If an injunction against Bob's were to be granted, the effect would be to enjoin RTC in its capacity as receiver, the very result that the statute prevents. There seems no reason to allow a request for injunctive relief to circumvent the expressed statutory language. Thus, the statute says the court cannot take "any action" to restrain the receiver, and this would apply to granting injunctive relief against Bob's.

1992 WL 319659, at *9.

 Were the court to disregard the jurisdictional issue and instead determine the claim for specific performance upon its merits, it would nevertheless deny it. Whether or not to order equitable relief addresses the discretion of the court. In this case the court declined the earlier request of defendant(s) to require plaintiff before or during

trial to formally elect between specific performance and damages for his remedy upon the contract. He may not obtain both types of relief, at least as to defendant TBI. Plaintiff did offer evidence, of course, relevant to both specific performance and damages. The evidence produced by plaintiff shows that damages for the breach are ascertainable. The jury found such damages to be in the amount of $350,000. The court finds this verdict consistent with the opinions expressed by Bernhard Furman, who testified as an expert witness on behalf of plaintiff. The court does not find that plaintiff has been irreparably damaged. The evidence fails to show, therefore, one of the requisites to specific performance, i.e. harm which is irreparable.

### CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT AS TO DEFENDANT RECOLL

In its motion defendant Recoll further contends for additional reasons that it is entitled to judgment as a matter of law against the claim for tortious interference with contract. It suggests that its conduct was privileged and justified. It also argues that it cannot be held liable for tortious interference, because it was not an outsider to the contract. In support, it cites the following language from *Dow Chem. Corp. v. Weevil–Cide Co.*, 897 F.2d 481 (10th Cir.1990): "It is well-established that the relation must be one to which the defendant is an outsider ... for one cannot 'interfere' with its own affairs." *Id.* at 488, 489. As a final point defendant argues that the damage claim is barred for failure of plaintiff to exhaust his administrative remedies under FIRREA.

The court finds that the question of justification or privilege as claimed by defendant Recoll was for the jury to decide. For the reasons already enumerated, evidence showed that Recoll not only knew of the already existing agreement with plaintiff, but had actively urged TBI to provide the necessary assurances to encourage its immediate performance. Recoll itself had approved the contract price of $1,500,000. Myskowski of Recoll had exclaimed that this was a deal, exactly what Recoll wanted. With encour-

agement by Recoll, TBI immediately proceeded with the next steps, including receipt of a deposit, encouragement that plaintiff perform due diligence, and immediate travel to Topeka to participate in that exercise. Only after defendant Wilson submitted a bid for $1,550,000 did Recoll express a requirement for a bidding process or otherwise reverse itself and decline to approve the sale to plaintiff.

The argument that Recoll was justified and privileged to seek the highest possible purchase price has some but limited merit. On behalf of the FDIC as its principal, Recoll did have and indeed asserted such justification and privilege in refusing approval of earlier proposals for lesser amounts. Having approved the price and having actively promoted performance of the contract for sale, however, it did not also have a privilege to induce a breach of it and thereby inflict damage upon a contracting party. Recoll not only reversed its previous approval, however, but also told Wilson that there was in fact no outstanding contract of sale. It eagerly encouraged him to submit a bid. The jury could find from this evidence that defendant Recoll was not justified and acted instead with malice, intentionally sacrificing the rights of one buyer for a potentially higher bid from defendant Wilson and without regard for the damage thereby imposed against the contractual rights of the plaintiff.

The court rejects the argument, furthermore, that Recoll is not an outsider to the contract between plaintiff and TBI and cannot be held liable for tortiously interfering with it. In support Recoll cites *Dow Chem. Corp. v. Weevil–Cide Co.*, 897 F.2d 481 (10th Cir.1990) and *Noller v. General Motors Corp.*, 244 Kan. 612, 772 P.2d 271 (1989). The court agrees with the principles stated in these two cases. It finds them, however, inapplicable. Plaintiff and defendant TBI entered into the contract here for the sale of a radio station. Both of them wanted Recoll to approve the purchase price, so that the station could be sold free and clear of the lien of a first mortgage. Defendant has cited no authority, and the court otherwise knows of none, which would cause such privilege of approval to transform Recoll into a party to

the contract and thus immunize it from liability for tortious interference.

In *Dow Chem. Corp.* the Tenth Circuit Court of Appeals held that "[a]n obvious element of the tort of intentional interference with a prospective contractual relation is a relation with which the defendant has interfered. It is well-established that the relation must be one to which the defendant is an outsider, for one cannot 'interfere' with its own affairs." 897 F.2d at 488–89 (footnote and citations omitted). The plaintiff in *Dow Chem. Corp.* "neither pleaded nor proved the existence of any prospective relation between [it] and anyone other than [its insurer]." *Id.* at 489. Under the applicable law (Wisconsin), the insurer was the "only prospective source of contribution." *Id.* The court, therefore, held that the insurer could not be held liable for interfering with its own prospective contractual relation. *Id.*

*Dow Chem. Corp.* is inapplicable on several grounds. It applies the law of Wisconsin, not of Kansas. It involves interference with a *prospective* contractual relationship, rather than tortious interference with an existing contract as is present here. Lastly, it involves the relationship between insured and insurer not present here. This last point is significant. The insurer was the "only prospective source of contribution" for the plaintiff in *Dow Chem. Corp.* Thus the court found that the insurer could not have interfered with the prospective contractual relationship, because it was a party to it. *Dow Chem. Corp.* does not stand for the proposition suggested by defendant that the privilege of approval possessed by Recoll transforms it into a party to the contract and thus immunizes it from liability for tortious interference under Kansas law.

*Noller* likewise does not stand for the proposition suggested by defendant. In *Noller* the Supreme Court of Kansas noted that "the tort of interference with a prospective business advantage occurs where a party improperly interferes with a prospective business advantage of a *third person.*" 244 Kan. at 620, 772 P.2d at 276. The district court had granted summary judgment to defendant General Motors "because the alleged interference did not arise from a relationship between Noller and a third person, but from Noller's potential relationship with GMC." *Id.* The Supreme Court affirmed the decision of the district court. *Id.*

Recoll has simply presented no authority for finding it a party to the contract here at issue. Neither *Dow Chem. Corp.* nor *Noller* support such a proposition. The court otherwise knows of no such authority.

■ Recoll further argues that the claim of plaintiff is barred for his failure to exhaust his administrative remedies under FIRREA. Specifically it cites 12 U.S.C. § 1821(d)(3). That subsection authorizes the FDIC as receiver to receive claims of creditors of the depository institution in receivership. The court finds the statute inapplicable to the claim of plaintiff here. He has not presented himself here as a creditor of the New Connecticut Bank and Trust Co., the institution in receivership. Nor has he here presented any claim against the assets of the bank. He has not, furthermore, presented any claim relating to any act or omission of the FDIC as receiver.

Defendant has cited several cases in support of its position: *Ward v. Resolution Trust Corp.*, 996 F.2d 99, 104 (5th Cir.1993); *Haney v. Castle Meadows, Inc.*, 839 F.Supp. 753, 759, 760 (D.Colo.1993); *Hill v. Imperial Sav.*, 852 F.Supp. 1354, 1369 (W.D.Tex.1992); *Forbes v. FDIC*, 850 F.Supp. 94, 96 (D.Mass. 1994); *Lloyd v. FDIC*, 812 F.Supp. 293, 300 (D.R.I.1993), *vacated on other grounds*, 22 F.3d 335 (1st Cir.1994). The court finds them inapplicable. It finds no merit in the argument of defendant on this point.

In *Ward* the RTC took over certain property as receiver for a failed thrift institution. After negotiating with several prospective purchasers, including plaintiff Ward, the RTC sold the property to PAI, a third-party. 996 F.2d at 101. Ward first sought to enjoin the sale of the property under the Administrative Procedure Act. *Id.* at 101–02. Upon failure, he sought to rescind the sale through other legal action. He sought no monetary or other relief. *Id.* at 100. The court held that the anti-injunction provision of FIRREA, 12 U.S.C. § 1821(j), precludes enjoinment or rescission. 996 F.2d at 103–04. It

noted in dictum that plaintiff had an alternative method of relief, "i.e., monetary damages through the mandatory administrative procedures set forth in FIRREA," 12 U.S.C. § 1821(d)(3)–(13). 996 F.2d at 104.

Despite factual similarities between *Ward* and the present case, the court sees no applicability of § 1821(d)(3)–(13). The plaintiff in *Ward* brought suit directly against the RTC for actions taken by it as receiver. Plaintiff here has made no claim relating to an act or omission of the FDIC as receiver. He is not a creditor of the failed bank. Nor is he making a claim against the assets of the bank.

The plaintiffs in *Haney, Lloyd,* and *Forbes* likewise brought suit directly against RTC (*Haney*) or FDIC (*Lloyd* and *Forbes*). The *Haney* court held that "Haney's breach of contract claim against RTC Receiver is subject to the exhaustion requirement." 839 F.Supp. at 759. The *Lloyd* court held that "those with claims against either a seized depository institution or its receiver must first present their claims to the receiver, who decides the disputes according to the procedures contained in the statute." 812 F.Supp. at 297. Quoting 12 U.S.C. § 1821(d)(13)(D), the *Forbes* court held that "[e]xcept as otherwise provided in this subsection, no court shall have jurisdiction over any [suits against the FDIC]." 850 F.Supp. at 97 (alteration in original). These three cases are thus distinguishable. Plaintiff here has not brought suit directly against the FDIC as receiver for the New Connecticut Bank and Trust Co., or against the failed bank itself.

*Hill* is also distinguishable. The plaintiff there sought "a determination of its rights in [certain property], an asset of the receivership of Imperial Federal, or alternatively ... damages from the receivership." 852 F.Supp. at 1368. The court held that these claims were "barred by § 1821(d)(13)(D)." *Id.* The present case appears to have no similar claims. The assets of the radio station belong to TBI. Plaintiff seeks no damages from FDIC.

## CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT AS TO DEFENDANT MARVIN WILSON, M.D.

▇ The court next addresses the remaining issue, asserted by defendant Wilson in his motions for judgment as a matter of law. He contends the evidence does not support the jury verdict that he tortiously interfered with the contract between plaintiff and defendant TBI. The court has already found the evidence sufficient to support the finding that a contract existed. Defendant Wilson further argues, however, that the evidence does not support a finding that he knew of the contract or of facts sufficient to put him as a reasonable person on notice that indeed a contract existed or that he acted with malice to interfere with it.

Upon the motion for judgment as a matter of law the court must view the evidence and all reasonable inferences from it in a light most favorable to plaintiff. So viewed, the evidence here shows the following: Defendant Wilson and others, doing business as Shawnee Broadcasting, had owned Station KTPK–FM before its sale to TBI in 1988. On or about August 10, 1993, station manager Pat Powers received a copy of the Letter of Intent by which plaintiff had proposed to buy the station. He transmitted it to Arthur Glassman, attorney for defendant Wilson. On or about August 16, 17 or 18, 1993 Wilson made a telephone inquiry to Mike Scinto of Recoll to ascertain if Station KTPK–FM was still for sale. Scinto said yes. He explained that Recoll was receiving bids and expected a sale to whoever might be the highest bidder. He encouraged Wilson to submit a bid.

Wilson also received from Glassman a copy of the letter of July 30, 1993, by which plaintiff Hoxeng had proposed to buy the station for $1,500,000. He learned that Hoxeng would be in Topeka on or about August 23 for his exercise in due diligence incidental to his prospective purchase. Glassman and Wilson communicated this information to their colleagues, all interested investors in the station. After discussing it on or about August 23, 1993, Wilson and his fellow investors instructed Glassman to submit to Recoll a bid to buy the station for $1,550,000, after receiving further assurance from Scinto that there was no other outstanding contract. On August 24, 1993, Glassman communicated these matters to Scinto. Scinto re-confirmed that the station remained for sale and that no

outstanding offer or contract existed. Glassman immediately transmitted to Recoll the offer by Wilson to buy the station for $1,550,-000.

On September 3, 1993, Scinto told Glassman the station was still for sale and that Recoll had received another offer. Scinto said Recoll would receive additional bids through September 15, 1993. On September 14, 1993, Glassman submitted on behalf of defendant Wilson and his group of investors a final bid of $1,650,000.

On September 15, 1993, Wilson also received from an attorney for plaintiff a FAX communication. It requested Wilson to cease and desist from further, attempted interference with the contract plaintiff claimed to have with TBI. Wilson disregarded this communication. He threw it away. He made no effort to contact either plaintiff or Recoll about it. He gave no consideration to a possible withdrawal of his bid. Recoll and its principal accepted the bid by Wilson and agreed to release the lien of the first mortgage upon sale of the station to Twenty–First Century, for whom Wilson had thus acted as nominee.

Defendant Wilson has cited several cases and the Restatement of Torts (Second) in support of his argument that he is entitled to judgment as a matter of law. The court has reviewed these authorities. It does not find them applicable here, however, to set aside the jury verdict and hold as a matter of law that the evidence fails to support it. In *Eckholt v. American Business Information, Inc.*, 873 F.Supp. 526 (D.Kan.1994) District Judge Vratil of this Court noted the various factors to be considered in determining intentional interference with a contract:

> Several factors are considered in determining whether an actor's conduct in intentionally interfering with a contract is improper: (a) the nature of the conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the actor's interests; (e) the social interests in protecting the actor's freedom to act and the other's contractual interests; (f) the proximity of the actor's conduct to the interference; and (g) the relations among the parties affected. *Tur-*

*ner [v. Halliburton Company*, 240 Kan. 1], 722 P.2d [1106] at 1116–17 [ (1986) ] (citing Restatement (Second) of Torts sec. 767 (1977)). Whether the interference was improper should be determined by evaluating these and other relevant factors on a case-by-case basis:

> ... [t]he issue in each case is whether the interference is improper or not under the circumstances; whether upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation.

Restatement (Second) of Torts sec. 767, cmt. B.

873 F.Supp. at 533.

From the evidence in this case a jury could reasonably infer that defendant Wilson gained enough knowledge about the interests of plaintiff in buying Station KTPK–FM to create an alert that a contract existed at least by the time he received a letter from plaintiff's attorney on September 15, 1993. Wilson was earlier aware of the plaintiff's Letter of Intent of July 30, 1993. A jury could reasonably assume that Wilson also knew that plaintiff had been in Topeka to perform his exercise in due diligence. Yet Wilson did nothing further to inquire about the content of the letter of September 15, informing him that plaintiff indeed claimed to have such a contract. Defendant made no move to make inquiry to Recoll or to contact TBI. He simply ignored it. The court concedes that the evidence against Wilson is weak for the purpose of sustaining the verdict against him. It cannot find, nevertheless, that the circumstances shown by the evidence together with all reasonable inferences compel a ruling to set it aside.

In summary and for the foregoing reasons the court makes the following rulings: It sustains Plaintiff's Motion to Alter or Amend the Judgment (doc. 238). By this ruling the court denies the request of plaintiff to enter a decree of specific performance and grants his request to confirm the judgment for dam-

ages. The court overrules the following motions: Defendant Marvin Wilson's Renewal of Rule 50 Motion and/or in the Alternative for Judgment Not Withstanding (sic) the Verdict (doc. 240); Motion for Judgment as a Matter of Law (doc. 242); Defendant Recoll Management Corporation's Motion for Judgment as a Matter of Law, Judgment Notwithstanding the Verdict and Renewed Motion for Summary Judgment (doc. 251). The court also overrules Defendant Recoll Management Corporation's Motion for Leave to Submit Supplemental Memorandum (doc. 283). It adds nothing of significance to the matters under consideration.

With these rulings the court also confirms the Nunc Pro Tunc Judgment entered on July 11, 1995, in favor of plaintiff and against the defendants Topeka Broadcomm, Inc., RECOLL Management Corp., and Dr. Marvin Wilson, M.D. The court further directs the Clerk to enter judgment in favor of all defendants and against plaintiff upon his claim for specific performance and for costs in favor of the co-defendant Twenty–First Century Broadcasting, Inc. against plaintiff.

IT IS SO ORDERED.