No. 60,903

LAIRD NOLLER, *Appellant,* v. GMC TRUCK AND COACH DIVISION, GENERAL MOTORS CORPORATION, *Appellee.*

(772 P.2d 271)

Opinion filed April 14, 1989.

*Charles D. McAtee,* of Eidson, Lewis, Porter & Haynes, of Topeka, argued the cause and *Anne L. Baker* and *John D. Ensley,* of the same firm, were with him on the briefs for appellant.

*John E. Muench,* of Mayer, Brown & Platt, of Chicago, Illinois, argued the cause and *Stephen M. Shapiro,* and *Stephen D. Gilles,* of the same firm; *Stephen A. Murphy,* of Gage & Tucker, of Overland Park, *Robert J. Harrop* and *Paul Scott Kelly, Jr.,* of the same firm, of Kansas City, Missouri; and *Charles E. Fairfax, III,* and *Judith A. Zakens,* of General Motors Corporation, of Detroit, Michigan, were with him on the briefs for appellee.

*William A. Newman,* senior counsel, National Automobile Dealers Association, of McLean, Virginia, and *Patrick R. Barnes,* of Scott, Quinlan & Hecht, of Topeka, were on the brief *amicus curiae* for National Automobile Dealers Association.

*Ron Campbell,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, and *Dixie F. Madden,* of the same firm, were on the brief *amici curiae* for Automobile Importers of America, Inc., and Motor Vehicle Manufacturers Association of the United States, Inc.

The opinion of the court was delivered by

HERD, J: This is a civil action brought by Laird Noller (Noller) against GMC Truck and Coach Division, General Motors Corporation (GMC). Noller contends he is a third-party beneficiary

of a franchise agreement between GMC and Jay Beard Trucks, Inc. (Beard). The district court granted GMC summary judgment. The Court of Appeals reversed and remanded the case for trial on two of three Noller claims. *Noller v. General Motors Corp.*, 13 Kan. App. 2d 13, 760 P.2d 688 (1988). We granted review and affirm the district court.

Beard approached Noller in January of 1982 about Noller buying Beard's dealership. Noller has been a Ford dealer in Topeka since 1974 and also owns two other automobile dealerships. Noller was interested in buying Beard's assets only if he could also acquire the GMC truck franchise. Beard's sale of his assets would terminate his Dealer Sales and Service Agreement (Dealership Agreement) with GMC, but GMC had contracted not to arbitrarily refuse to grant a new owner a franchise.

The fourth paragraph of the Dealership Agreement states:

**"Changes in Management and Ownership**

"If Dealer desires to make a change in its Dealer Operator(s) or ownership or sell its principal assets to a party that wishes to become an authorized dealer, Dealer will give General Motors prior written notice of the proposed change or sale. General Motors shall *not arbitrarily refuse* to agree to such proposed change or sale.

"Dealer agrees to provide in the form requested and in a timely manner all applications and information customarily requested by General Motors to evaluate the proposed change or sale. General Motors agrees to consider all factors requested by Dealer and base its decision on whether the proposed change is likely to result in a successful dealership operation with acceptable management and ownership which will provide satisfactory sales and service for GMC Truck customers at the approved location."

The second paragraph of the Dealership Agreement incorporates by reference certain additional provisions:

**"ARTICLE III. SUCCESSOR AND REPLACEMENT DEALERS**
**"(A) Rights of General Motors**
"(1) *Selection of Dealers*
"The parties recognize that Motor Vehicles are marketed through a system of authorized dealers developed by General Motors and that customers and authorized dealers, as well as shareholders and employees of General Motors, have a vital interest in the preservation and efficient operation of the system. General Motors has the responsibility of continuing to administer the system and selecting the most suitable dealer candidate in each circumstance.

"Accordingly, General Motors has the right to select each successor and replacement dealer and to approve its owners and principal management and the location of its dealership facilities. General Motors shall perform such responsibility as set forth in Paragraph FOURTH on the basis of evaluating each

candidate's qualifications and proposal for the conduct of dealership operations against the standards set forth in this Agreement.

*"(2) Review of Applications*

"In selecting replacement dealers, General Motors may process applications for a replacement dealer agreement, and may consult with applicants on any aspect of their proposals or General Motors requirements, at any time after a notice of termination or expiration has been served or Dealer has proposed a sale of assets or change of ownership or management. Any such replacement dealer agreement shall not become effective prior to the effective date of termination or expiration of this Agreement.

. . . .

*"C. Other Changes in Management and Ownership or Sale of Assets*

"In order for General Motors to effectively perform its responsibility to administer the authorized dealer system, Dealer agrees in Paragraph FOURTH to give General Motors prior written notice of any proposed change in its Dealer Operator(s) or ownership or any proposed disposition of its principal assets. In turn, General Motors agrees to consider Dealer's proposal under the standards identified in Paragraph FOURTH and not to arbitrarily refuse to agree to such proposal. In determining whether the proposal is acceptable to it, General Motors will take into account the qualifications, personal and business reputation and financial standing of the proposed dealer operator and owners, as well as General Motors' interest in promoting and preserving competition among General Motors dealerships, and between those dealerships and dealerships representing competing motor vehicle manufacturers.

"Dealer shall be notified in writing of General Motors' agreement or disagreement to Dealer's proposal within sixty days after Dealer has furnished all applications and information reasonably requested by General Motors to evaluate such proposals."

Beard had notified GMC in 1981 that he was going to attempt to sell his company. GMC offered the following guidance in a letter to Beard:

"1. You have the right to sell the physical assets of your company at any time to anyone you wish on whatever basis you may negotiate.

"2. The sale of the assets of your company will necessarily result in the termination of the Dealer Sales and Service Agreement for GMC Truck Motor Vehicles in effect between us.

"3. The Dealer Agreement by its own terms is not transferable, assignable or saleable by a Dealer and conveys no property right to your company. GMC Truck retains the right to select and appoint each Dealer, to approve its owners and principal management, and to do so on the basis of evaluating the candidate's qualifications and proposal.

"4. General Motors has a policy that before prospective replacement dealer representation is considered, a review is made through the appropriate Divisional and Corporate levels of the continued viability of the particular dealer location, and the desirability of continuing dealer representation there. In your case, we anticipate completing that review in the near future and will advise you of our intentions with respect to our future representation at your location at that time. GMC Truck does not assume responsibility for locating individuals with

whom you or your representatives may negotiate a sale of your assets. However, as a courtesy to you, GMC Truck will be pleased to refer to you any individuals whom we believe might be interested in discussing this matter with you. Any such referral shall not be construed by either you or such individuals as indicating that GMC Truck has made, or will make, a commitment to such individuals to execute a Dealer Agreement with them until the negotiations between the parties have been completed and the proposal of the franchise applicant has been reviewed and found acceptable to GMC Truck.

"6. GMC Truck does not become involved in negotiations between parties for the purchase and sale of physical assets of a Dealer. Our interest in this aspect of proposals submitted to us by otherwise acceptable franchise applicants is limited to an evaluation of the projected effect of proposed investments on the capital position of the proposed dealership, and on the projected return on investment.

"7. We recommend any agreement which you make for the sale of your company's assets should be conditioned upon the approval by GMC Truck of such party and his or her proposal for a Dealer Agreement."

On February 19, 1982, after GMC's district manager had visited Noller's truck dealership on U.S. Highway 24 in North Topeka with Beard, he and GMC's zone manager met with Beard and told him to forward an agreement with Noller for processing. On February 24, 1982, Noller agreed to buy, and Beard to sell, the dealership assets. Paragraph 11(a) of the agreement specifically stated the agreement was conditioned on GMC's approval, as Noller was not interested in Beard's assets without the GMC Truck franchise.

On May 6, 1982, GMC informed Beard by letter of its decision to refuse a franchise to Noller. No reason was given for the decision. GMC had not contacted Noller or conducted any investigation of his qualifications to operate a GMC truck dealership. Neither Beard nor Noller had attempted to provide GMC with such information.

During discovery, GMC officials testified they refused to recommend approval of the agreement because they believed Noller intended to locate the truck franchise on Highway 24 in North Topeka. Noller testified he was flexible in his plans and would have done whatever was necessary to obtain a GMC franchise. He had planned, however, to locate the heavy and medium trucks at the Highway 24 location but place the light GMC trucks at 21st Street and Topeka Boulevard. He estimated he would receive at least $201,000 net profit per year from the total GMC franchise. He estimated he would sell at least 25% of the number of light GMC trucks as he did Ford trucks at a location a block away from the 21st and Topeka location. Beard

testified he believed the transaction was not approved because Noller was a Ford dealer. On March 11, 1982, the regional manager had recommended to GMC management: "I *do not* recommend dualing with Ford."

After GMC's refusal to grant Noller a franchise, Noller cancelled his contract with Beard. Beard then sold his business to Maurice Lombardo, an International Harvester dealer. GMC approved Lombardo for a franchise after receiving his application, financial information, a proposed dealer balance sheet, and plans for location of the dealership. In May of 1983, GMC approved Lombardo's sale of the light truck line to Bill Kobach Buick, Inc. Kobach located the franchise at 21st and Topeka Boulevard, across the street from the location contemplated by Noller.

Noller filed this suit on May 4, 1984. Beard's suit against GMC, filed in the United States District Court, was dismissed with prejudice on August 17, 1988.

The Noller suit alleged breach of contract, tortious interference with prospective business advantage, and tortious interference with contract. The breach of contract claim was based on the Dealership Agreement between GMC and Beard in which GMC promised Beard not to arbitrarily refuse to agree to a proposed sale and to take into account the proposed operator's qualifications. Noller claimed he was a third party beneficiary of this promise.

The district court granted GMC's motion for summary judgment on all counts. The court held Noller was an incidental rather than an intended beneficiary of the Dealership Agreement and therefore had no standing to sue for breach of contract. The court also held Noller failed to allege or prove elements of his tort claims.

A majority of the Court of Appeals panel agreed with the district court that there was no tortious interference with contract, but reversed and remanded for a jury trial on the claims of interference with prospective business advantage and breach of contract. The court found Noller to be an intended beneficiary of the Dealership Agreement between GMC and Beard. This appeal followed.

Let us first review the law pertaining to the granting of summary judgment. K.S.A. 1988 Supp. 60-256(c) authorizes summary

judgment only when there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. The party against whom the motion is directed must be given the benefit of all reasonable inferences and doubts which may be drawn from the facts. *Lantz v. City of Lawrence,* 232 Kan. 492, 497, 657 P.2d 539 (1983).

We recognize courts should be cautious in granting summary judgment where the issues in the case, as here, involve questions of the intent of the parties. Summary judgment is nevertheless proper where the intent, as here, is clearly expressed in the contract and the court finds no question presented. Knowledge that a contract will benefit a third party is not *intent* to benefit the third party. See *Corrugated Paper. Products v. Longview Fibre Co.,* 868 F.2d 908, 912 (7th Cir. 1989).

Let us now turn to the first issue of the case, whether Noller was an intended beneficiary of the Dealership Agreement between GMC and Beard. The facts support the finding by the Court of Appeals that GMC breached its agreement with Beard to take into account the qualifications of a proposed buyer and not arbitrarily refuse to agree to a sale of its franchise. However, it is important to remember Noller was not a party to that contract.

We have long held: "Contracting parties are presumed to act for themselves and therefore an intent to benefit a third person must be clearly expressed in the contract." *Cornwell v. Jespersen,* 238 Kan. 110, 115-16, 708 P.2d 515 (1985). There is no expression of an intent to benefit a third party in the Dealership Agreement. Instead, the provisions of the Dealership Agreement indicate GMC and Beard did not have an intention to benefit a third party. The Dealership Agreement provided that it was a personal service contract and that no right or responsibility under the agreement could be transferred. The intention of the parties is to be determined from the instrument itself where the terms are plain and unambiguous. *Fasse v. Lower Heating & Air Conditioning, Inc.,* 241 Kan. 387, 391, 736 P.2d 930 (1987).

We further note there was no detrimental reliance by Noller on the agreement. "The right of a third-party beneficiary rests chiefly upon the fact that the contract will create reasonable expectations on his part and will induce him to change his

position in reliance." 4 Corbin on Contracts § 775 (1951). See Restatement (Second) of Contracts § 90 (1979).

There are three traditional categories of third-party beneficiaries: donee, creditor, and incidental. Donee and creditor beneficiaries are intended beneficiaries and may sue to enforce a contract; incidental beneficiaries may not. *Cornwell v. Jespersen,* 238 Kan. at 115; *Martin v. Edwards,* 219 Kan. 466, 472, 548 P.2d 779 (1976). As the district court correctly held, Noller is "not a donee beneficiary, as the purpose of the DSSA was not to make a gift to Noller. Nor is Noller a creditor beneficiary, as no duty was owed to Noller by GMC under the DSSA. Rather, the benefits to Noller under the agreement are merely incidental to performance of the DSSA." Therefore, Noller's third-party beneficiary claim fails as a matter of law and is subject to summary judgment.

In *Fasse,* 241 Kan. at 389, we noted that more recent analyses of third-party beneficiary laws have divided beneficiaries into two general classes—intended beneficiaries and incidental beneficiaries. Only the intended class of beneficiaries may sue to enforce a contract. We found the plaintiff construction workers in *Fasse* had been intended beneficiaries in a contract between their employer and Washburn University. The parties to the contract clearly intended that an addendum to the contract would benefit the employees. The facts showed that Washburn University owed the employees a duty to stipulate in the contract that adequate statutory wages would be paid to the contractor's employees, pursuant to K.S.A. 44-201 and 44-202.

*Fasse* does not stand for a change in third-party beneficiary law, as Noller contends. Rather, it emphasizes that, where the contract expressly designates an intended beneficiary, that beneficiary becomes a protected party to the agreement. K.S.A. 1988 Supp. 8-2416, cited by Noller, differs from the statutes cited in *Fasse.* K.S.A. 1988 Supp. 8-2416 provides protection only to a party to the contract, the dealer. No protection is provided to a third-party beneficiary. Noller was not an intended beneficiary to the contract between Beard and GMC and is thus not entitled to sue for contractual benefits.

The second issue is whether the district court erred in granting GMC's motion for summary judgment on Noller's claim of tortious interference with prospective business advantage and tor-

tious interference with contract. The district court distinguished the claim of tortious interference with prospective business advantage from the claim of tortious interference with contract. The advantage claim involves Noller's potential dealer agreement with GMC. The contract claim involves the buy/sell agreement between Noller and Beard. Count one of Noller's petition alleges:

·"Because of defendant's intentional, arbitrary, unjustified, and wrongful refusal to permit transfer of the GMC dealership to plaintiff, defendant has tortiously interfered with prospective advantages which would have been acquired by plaintiff had he been permitted to buy and operate the GMC dealership."

Count three alleges:

"As a result of defendant's failure to consider the sale and transfer of the GMC dealership in good faith and in accordance with contractual obligations owing Jay Beard, defendant has intentionally and unjustifiably interfered with the contractual relationship existing between Jay Beard and plaintiff."

The Court of Appeals agreed with the district court's conclusion that the contract interference claim must fail. The agreement by its very terms recognized GMC's right to refuse approval. Noller voluntarily rescinded the contract under the contingency provided in the agreement. He could have retained his agreement with Beard had he so desired, but he deemed it not to his advantage to do so.

In a recent decision by the New York Supreme Court, summary judgment was granted on identical circumstances. A prospective buyer of a dealership brought suit against GMC for tortious interference with contract when GMC failed to approve him for a franchise. As in the case at bar, the buy/sell agreement was contingent upon GMC's approval of the plaintiff as a franchisee. The court held GMC had not induced a breach of contract between the plaintiff and the dealer, but simply exercised its right to refuse to enter into a franchise agreement with the plaintiff. *Morse v. Ted Cadillac, Inc.*, 146 App. Div. 2d 756, 537 N.Y.S.2d 239 (1989).

Here, the Court of Appeals did not agree with the district court's analysis of Noller's claim of tortious interference with a prospective business advantage. We recognized the tort in *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986), where we held the plaintiff must establish the following to state a cause of action:

"(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct."

*Maxwell v. Southwest Nat. Bank, Wichita, Kan.,* 593 F. Supp. 250, 253 (D. Kan. 1984); see Restatement (Second) of Torts § 766B (1977).

As the district court correctly held, the tort of interference with a prospective business advantage occurs where a party improperly interferes with a prospective business advantage of a *third person.* See Restatement (Second) of Torts § 766B, which provides:

"One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

"(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

"(b) preventing the other from acquiring or continuing the prospective relation."

The district court granted summary judgment because the alleged interference did not arise from a relationship between Noller and a third person, but from Noller's potential relationship with GMC via the prospective franchise agreement.

Noller argues on appeal that he does not claim that GMC interfered with their expected relationship from the franchise agreement, but with his expected advantage with Beard and potential GMC truck purchasers. We have already noted that it was Noller's decision to end his relationship with Beard. As to the advantage to be gained through potential GMC truck purchasers, this was only to be gained through GMC's approval of a franchise agreement. As Noller was merely an incidental beneficiary under GMC's agreement with Beard not to arbitrarily refuse to approve sale of the franchise, GMC had no duty to Noller to grant him a franchise.

We affirm in part and reverse in part the judgment of the Court of Appeals and affirm the judgment of the district court.

SIX, J., not participating.