**R.A., INC., et al., Appellants,**

**v.**

**ANHEUSER-BUSCH, INC., Respondent.**

**No. C1–96–779.**

Court of Appeals of Minnesota.

Dec. 3, 1996.

Review Denied Jan. 29, 1997.

Joseph A. Thomson, Steven D. Kelley, Lindquist & Vennum P.L.L.P., J. Michael Dady, Ronald K. Gardner, J. Michael Dady & Associates, P.A., Minneapolis, for Appellants.

Jerry W. Snider, John Edward Connelly, Faegre & Benson LLP, Minneapolis, for Respondent.

Considered and decided by WILLIS, P.J., and LANSING and KALITOWSKI, JJ.

## OPINION

KALITOWSKI, Judge.

R.A., Inc., et al., (appellants) challenge the determinations of the district court that: (1) respondent Anheuser–Busch, Inc. (A–B) was entitled to summary judgment on appellants' claims of tortious interference with existing and prospective contracts; and (2) appellants lacked standing to bring a claim under the Minnesota Beer Brewers and Wholesalers Act (Act).

## FACTS

A–B is a brewer of beers that sells its products through a network of authorized wholesalers. Capitol City Distributing Co., Inc. (Capitol City) was an exclusive wholesaler of A–B products.

R.A., Inc. (RA) is a corporation formed to purchase Capitol City. Richard Arrell is a shareholder and director of RA. Arrell was the general manager of Capitol City and had an agreement to serve as RA's president and chief executive officer. Paul Schnoebelen is also a director of RA. Schnoebelen had a written employment contract to serve as RA's chief financial officer. Plaintiff Parkview Management, Inc. (Parkview) is a corporation wholly owned by Schnoebelen that had a written contract to provide management services to RA. Nonparty Beechwood Partners, L.P. (Beechwood) is the other RA shareholder. Parkview is the general partner of Beechwood.

A–B had a written agreement with Capitol City entitled the "Anheuser–Busch, Inc. Wholesaler Equity Agreement" (Equity Agreement). The Equity Agreement set forth the terms and conditions governing Capitol City's wholesaler relationship with A–B. It contained A–B's procedures for evaluating proposed changes in wholesaler ownership and the standards A–B applied when deciding whether to approve a proposed sale. Under the Equity Agreement, A–B had the right to terminate the agreement if Capitol City sold, transferred, or assigned its right to wholesale A–B's products without first obtaining A–B's written consent. If A–B approved a sale of Capitol City, then A–B would either enter into a new Equity Agreement with the purchaser, or would permit Capitol City to assign its rights under the existing A–B/Capitol City Equity Agreement.

The Equity Agreement listed factors that A–B might take into consideration in evaluating a prospective purchaser, including financial capability, business experience, moral character, and personality. Under the Equity Agreement, Capitol City was obligated to provide A–B with appropriate information to evaluate the potential purchaser.

The Equity Agreement also stated that no third parties, such as prospective purchasers, had claims against A–B. None of the appellants were a party to the Equity Agreement,

and all the parties agree that appellants were not third-party beneficiaries to the contract.

Richard Arrell and Paul Schnoebelen, on behalf of a corporation to be formed, entered into a letter of intent with the shareholders of Capitol City, agreeing to purchase substantially all of Capitol City's assets, including its rights under the Equity Agreement. Ultimately, the letter resulted in an Acquisition Agreement between the parties that was conditioned upon obtaining A–B's approval of RA as a buyer.

Thereafter, A–B was sent a Request for Approval of Proposed Change of Ownership from Capitol City owners Michael Groppoli and Lauro DiSanto. Over the course of the next year, A–B made several requests for information necessary to complete its analysis of RA, and Capitol City responded to A–B's requests.

After completing its analysis, A–B informed Capitol City that it was denying approval of the sale of Capitol City to RA. The disapproval letter stated that A–B was concerned that RA would be unable to comply with the Equity Agreement marketing and capital expenditure requirements while servicing its debt; RA would breach several loan covenants that would place it in default; and that RA would have other financial difficulties. In addition, A–B was concerned that many of the provisions of the R.A. Inc. Shareholders' Agreement imposed serious and unacceptable constraints on the management and business operations of RA. The letter also noted a concern about the veto power given to the limited partners, suggesting the provision indicated that the limited partners lacked confidence in Arrell's ability to manage the business.

Subsequently, appellants commenced this lawsuit against A–B alleging: (1) A–B tortiously interfered with RA's contract to purchase Capitol City; (2) A–B tortiously interfered with the contract between Parkview and RA; (3) A–B tortiously interfered with Arrell's economic expectancy in his relations with RA; (4) A–B tortiously interfered with Schnoebelen's employment contract with RA; and (5) A–B violated the Act.

The district court dismissed, for failure to state a claim, appellants' claim against A–B for violation of the Act. The court said that because appellants were not licensed wholesalers, they lacked standing to bring suit under the Act. In response to cross-motions for summary judgment, the district court granted A–B's motion for summary judgment on appellants' remaining claims.

## ISSUES

1. Did the district court err in granting A–B summary judgment on appellants' claims of tortious interference with contract?

2. Did the district court err in granting A–B summary judgment on appellants' claims of tortious interference with prospective contractual relations?

3. Did the district court err in determining that appellants did not have standing to bring a claim against A–B for violation of the Act?

## ANALYSIS

On appeal from summary judgment, a reviewing court determines whether any genuine issues of material fact exist and whether the district court erred in its application of the law. *Wartnick v. Moss & Barnett,* 490 N.W.2d 108, 112 (Minn.1992). In doing so, the court views the evidence in the light most favorable to the nonmoving party. *State by Beaulieu v. City of Mounds View,* 518 N.W.2d 567, 571 (Minn.1994). However, a party cannot rely on speculation or general assertions to create a genuine issue of material fact. *Nicollet Restoration, Inc. v. City of St. Paul,* 533 N.W.2d 845, 848 (Minn.1995). "Summary judgment is appropriate when a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Iacona v. Schrupp,* 521 N.W.2d 70, 72 (Minn.App.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). No deference need be given to the district court's application of the law. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984.)

## I.

■ Minnesota recognizes a cause of action for tortious interference with contractual relations. *United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 632 (Minn.1982). To establish such a claim, a party must prove:

(1) existence of a contract;

(2) alleged wrongdoer's knowledge of the contract;

(3) his intentional procurement of its breach;

(4) without justification; and

(5) damages resulting therefrom.

*Aslakson v. Home Sav. Ass'n,* 416 N.W.2d 786, 788 (Minn.App.1987) (citing *Royal Realty Co. v. Levin,* 244 Minn. 288, 292, 69 N.W.2d 667, 671 (1955)).

■ The existing contracts that appellants claim A–B interfered with are: (1) the acquisition agreement between RA and Capitol City; (2) the Parkview Management contract; and (3) Schnoebelen's employment contract. Each of these contracts contained a condition precedent. The Acquisition Agreement required the consent of A–B and the other two contracts required the closing of the Acquisition Agreement. Thus, in effect, all three contracts were conditioned on A–B's approval of Capitol City's proposed sale.

The Minnesota Supreme Court, in *Lake Co. v. Molan,* 269 Minn. 490, 131 N.W.2d 734 (1964), stated:

A condition precedent, as known in the law, is one which is to be performed before the agreement of the parties becomes operative. A condition precedent calls for the performance of some act or the happening of some event after the contract is entered into, and upon the performance or happening of which its obligation is made to depend.

*Id.* at 498–99, 131 N.W.2d at 740 (quoting *Chambers v. Northwestern Mut. Life Ins. Co.,* 64 Minn. 495, 497, 67 N.W. 367, 368 (1896)).

In *Aslakson,* this court explained the significance of a condition precedent in the context of a claim for tortious interference with contract:

A conditional promise prevents a party from acquiring any rights under the contract unless those conditions occur. Furthermore, a breach of contract does not occur when a contract is conditioned on third-party approval and the approval is not received. If the event required by the condition does not occur, there can be no breach of contract, since the contract is unenforceable.

*Aslakson,* 416 N.W.2d at 789.

In this case, the contract between Capitol City and RA was conditioned on A–B's approval. Because A–B's approval was never given, the contract remained unenforceable and neither party could breach it. The other two contracts, which were conditioned on a contract that did not become enforceable, likewise were not enforceable and could not be breached.

■ Appellants further argue that pursuant to the Equity Agreement, A–B automatically approved the sale when it did not notify Capitol City within 30 days after receiving information it requested. A–B disputes that the 30-day period ran. This disputed fact is not material, however, because Capitol City is not a party to this action and appellants were neither parties nor third-party beneficiaries of the Equity Agreement. A potential purchaser does not have a right to assert claims based on a contract to which it is not a party or third-party beneficiary. *Wurm v. John Deere Leasing Co.,* 405 N.W.2d 484, 486 (Minn.App.1987).

Appellants could not establish the breach of a contract, an element of their tortious interference with contractual relations claims. Therefore, the district court's grant of summary judgment in favor of A–B on these claims was proper.

## II.

In *United Wild Rice,* the supreme court recognized a tort claim for interference with prospective contracts, adopting the Restatement (Second) of Torts definition which states:

One who intentionally and *improperly* interferes with another's prospective contractual relation * * * is subject to liabili-

ty to the other for the pecuniary harm resulting from loss of the benefits of the relations, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

*United Wild Rice,* 313 N.W.2d at 632–33 (citing Restatement (Second) of Torts § 766B (1979)) (emphasis added).

■ The law clearly requires the actor's conduct to be improper before liability for interference with prospective contractual relations will attach. To determine whether the actor's conduct is improper, several factors must be examined. Restatement (Second) of Torts § 766B cmt. a. These factors are:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

*Id.* at § 767; *Northside Mercury Sales & Serv. v. Ford Motor Co.,* 871 F.2d 758, 761 (8th Cir.1989) (applying Minnesota law).

■ Here, A–B is asserting its contractual right to approve the sale of Capitol City to RA. If A–B had approved the sale, RA would have become an authorized wholesaler for A–B. Thus, RA alleges A–B's action directly interfered with RA's interest in becoming an authorized wholesaler for A–B. This interest, however, must be compared to A–B's recognized contractual right to choose its wholesalers. Although RA questions A–B's motives for refusing to approve the sale, it is undisputed that A–B had the *right* to

approve or disapprove. Further, there is no evidence to support the contention that A–B's exercise of its contractual right was motivated by anything other than business reasons. Therefore, we conclude as a matter of law that appellants have not established A–B's alleged interference was improper.

This analysis is consistent with the rulings in the two cases relied on by the district court, *Genet Co. v. Annheuser–Busch, Inc.,* 498 So.2d 683 (Fla.Dist.Ct.App.1986),[1] and *Noller v. GMC Truck & Coach Div.,* 244 Kan. 612, 772 P.2d 271 (1989). The facts in *Genet* are similar to the facts here. The prospective buyers filed suit, claiming that Annheuser–Busch, Inc. interfered with their contract with the seller by disapproving the proposed transfer of the seller's distributorship to them. *Genet,* 498 So.2d at 684. The court, in affirming summary judgment, disagreed stating:

[W]hat the [buyers] sought, through their agreement with [seller], was to obtain an A–B wholesalership and enter into an Equity Agreement with A–B. Thus, A–B was the source of the business opportunity which [buyers] sought. The tort of willful interference with a business relationship does not exist where the defendant was the source of the business opportunity allegedly interfered with.

*Id.* (citations omitted).

In *Noller,* the Supreme Court of Kansas addressed a similar issue in the context of the sale of an automobile dealership. The prospective buyer of the dealership sued the franchisor for intentional interference with prospective business advantage and intentional interference with contractual relations because the franchisor refused to consent to the sale. *Noller,* 772 P.2d at 271. The court, affirming summary judgment for the franchisor, stated:

The district court granted summary judgment because the alleged interference did not arise from a relationship between [buyer] and a third person, but from [buyer's] potential relationship with [franchi-

1. Despite the variation in spelling, Annheuser–Busch, Inc. and Anheuser–Busch, Inc. are the same entity.

sor] via the prospective franchise agreement.

[Buyer] argues on appeal that he does not claim that [franchisor] interfered with their expected relationship from the franchise agreement, but with his expected advantage with [seller] and potential GMC truck purchasers. We have already noted that it was [buyer's] decision to end his relationship with [seller]. As to the advantage to be gained through potential GMC truck purchasers, this was only to be gained through [franchisor's] approval of a franchise agreement.

*Id.* 772 P.2d at 276–77.

While these cases do not explicitly refer to the section 767 factors, the analysis used in them is consistent with the Restatement. Both courts looked at the nature of the actor's conduct, which involved the assertion of a contractual right, and compared it to the interests the actor interfered with while asserting its contractual right.

Because as a matter of law A–B's conduct was not improper, appellants failed to establish a prima facie case for interference with prospective contractual relations. Accordingly, the district court properly granted summary judgment in favor of A–B on appellants' claims of tortious interference with prospective contractual relations.

## III.

In reviewing cases dismissed for failure to state a claim on which relief can be granted, "the only question before [the reviewing court] is whether the complaint sets forth a legally sufficient claim for relief." *Elzie v. Commissioner of Pub. Safety,* 298 N.W.2d 29, 32 (Minn.1980) (quoting *Royal Realty,* 244 Minn. 288, 290, 69 N.W.2d 667, 670).

■ For appellants to have a legally sufficient claim under the Act, they must have standing. Standing is a jurisdictional question to be determined by the court. *In re Implementation of Util. Energy Conservation Improvement Programs,* 368 N.W.2d 308, 312 (Minn.App.1985). "When a statute designates the persons who may bring a claim, only the persons so designated have the right to bring such an action." *Gloria*

*Dei Lutheran Church Missouri Synod v. Gloria Dei Lutheran Church,* 513 N.W.2d 488, 490 (Minn.App.1994) (quoting *In re Swope,* 190 Mich.App. 478, 476 N.W.2d 459, 460 (1991)).

■ The Act states, "[i]f a brewer engages in conduct prohibited by sections 325B.01 to 325B.17, a wholesaler may maintain a suit against the brewer." Minn.Stat. § 325.08 (1994). Prohibited conduct includes the unreasonable withholding of consent "to any assignment, transfer or sale of the wholesaler's business." Minn.Stat. § 325B.06 (1994).

"Beer wholesaler" is defined by the Act as

any licensed person importing or causing to be imported into this state or purchasing or causing to be purchased within this state, any beer for sale or resale to retailers or wholesalers licensed under chapter 340, without regard to whether the business of the person is conducted under the terms of an agreement with a licensed brewer.

Minn.Stat. § 325B.01, subd. 3 (1994). A "person" is

a natural person, corporation, partnership, trust, agency, or other entity as well as the individual officers, directors, or other persons in active control of the activities of each such entity.

*Id.* at subd. 5.

The district court found the words of the Act to be clear and unambiguous. "[W]hen the words of a statute are clear and unambiguous, [the court] must give effect to the plain meaning of the language." *Gloria Dei Lutheran Church,* 513 N.W.2d at 490 (citing *Tuma v. Commissioner of Econ. Sec.,* 386 N.W.2d 702, 706 (Minn.1986)). Appellants did not allege that they were licensed by the State of Minnesota as beer wholesalers. Therefore, the district court concluded that appellants lacked "standing under the Act to pursue a private right of action against A–B." We agree.

The clear and unambiguous language of the statute requires a person to be licensed by the State of Minnesota as a beer wholesaler to have standing under it. Thus, a prospective purchaser not already licensed as a

beer wholesaler does not have standing to pursue a private cause of action against a brewer. Accordingly, we affirm the district court's dismissal of appellants' claim under the Act.

## DECISION

The district court properly concluded: (1) Anheuser–Busch, Inc. was entitled to summary judgment on appellants' claims of interference with existing and prospective contracts; and (2) appellants lacked standing to bring a claim under the Minnesota Beer Brewers and Wholesalers Act.

**Affirmed.**