**J.K.P. FOODS, INC.; and James A. O'Brien, Plaintiffs**

v.

**McDONALD'S CORPORATION, Defendant.**

**No. 4:05 CV 01923 JLH.**

United States District Court, E.D. Arkansas, Western Division.

March 14, 2006.

John Richard Yates, Catlett & Stodola, Plc, Little Rock, AR, for Plaintiffs.

Nate Coulter, Wilson, Engstrom, Corum & Coulter, Little Rock, AR, for Defendant.

### OPINION AND ORDER

HOLMES, District Judge.

This action concerns McDonald's Corporation's alleged disruption of the plaintiffs' potential sale of two McDonald's restaurants in Jacksonville, Arkansas. The complaint contains three state-law claims: Count I alleges tortious interference with a contractual relationship; Count II alleges breach of contract; and Count III alleges a violation of the Arkansas Franchise Practices Act ("AFPA"). Pursuant to Federal Rule of Civil Procedure 12(b)(6), McDonald's has moved to dismiss the plaintiffs' tortious interference and AFPA claims. For the following reasons, the motion to dismiss is granted, and Counts I and III of the complaint are dismissed with prejudice.

### I.

The plaintiffs owned five McDonald's restaurants in Arkansas, including two in Jacksonville. James A. O'Brien entered into a franchise agreement with McDonald's for each of the Jacksonville restaurants. Paragraph 15(d) of both agreements stated, "Licensee shall not sell, transfer, or assign this Franchise to any person or persons without McDonald's prior written consent. Such consent shall not be arbitrarily withheld." Both agreements also stated that the restaurants would be "operated in conformity to the McDonald's System through strict adherence to McDonald's standards and policies"; that McDonald's had the right to inspect the restaurants "at all reasonable times to ensure that Licensee's operation thereof is in compliance with the standards and policies of the McDonald's System"; that plaintiffs as Licensees had the right "to adopt and use ... the trade names, trademarks, and service marks" of McDonald's "in connection with the sale of those food and beverage products which have been designated by McDonald's at the Restaurant"; and that the plaintiffs were required to pay a fee of $22,500 per franchise in consideration for the grant of the franchises.

The complaint alleges that the plaintiffs advised McDonald's in late 2002 that they were interested in selling the two Jacksonville restaurants and that Chandler Ray Johnson was interested in buying them. The complaint further alleges that the plaintiffs entered into a Purchase and Sale Agreement with Johnson whereby Johnson would pay $1.4 million for the two restaurants and, as part of the transaction, would be responsible for required reinvestment in addition to the sales price. The complaint states that the plaintiffs and Johnson estimated that the required reinvestment for the two restaurants would be approximately $280,000.

The complaint alleges that McDonald's did not approve of the sale of the two Jacksonville restaurants to Johnson. It alleges that McDonald's reported the required reinvestment for the Jacksonville restaurants as $655,000 and, contrary to the plaintiffs' wishes, communicated that figure to Johnson. The complaint states that Johnson contacted O'Brien in January 2003 and informed O'Brien "that he wanted out of the agreement with Plaintiff because the required reinvestment numbers were 'so high.'" The complaint alleges that Johnson purchased a McDonald's restaurant located in Brinkley, Arkansas, ap-

proximately two months later. The complaint states that the plaintiffs sold the two Jacksonville restaurants to Raymond Nosler on October 31, 2003.

On November 28, 2005, the plaintiffs commenced this action against McDonald's in the Circuit Court of Pulaski County, Arkansas. McDonald's removed the case to this Court based on diversity of citizenship.

## II.

In considering a motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff and must accept the allegations in the complaint as true. *Coleman v. Watt,* 40 F.3d 255, 258 (8th Cir.1994). A motion to dismiss can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) only if "it appears beyond a doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Schmedding v. Tnemec Co., Inc.,* 187 F.3d 862, 864 (8th Cir. 1999). "[A]s a practical matter, dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 546 (8th Cir.1997). A motion to dismiss brought pursuant to Rule 12(b)(6) is based on the complaint and the documents referenced in the complaint. *Enervations, Inc. v. Minn. Mining & Mfg. Co.,* 380 F.3d 1066, 1069 (8th Cir.2004). Because the complaint specifically references the franchise agreements, the Court can consider them in ruling on a 12(b)(6) motion without converting the motion into a motion for summary judgment. *Moses.com Sec., Inc. v. Comprehensive Software Systems, Inc.,* 406 F.3d 1052, 1063 n. 3 (8th Cir.2005).

## III.

To state a claim for tortious interference, a plaintiff must allege (1) the existence of a valid contractual relationship; (2) knowledge of the relationship on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship; (4) resultant damage to the party whose relationship has been disrupted; and (5) the defendant's conduct must be improper. *Faulkner v. Ark. Children's Hosp.,* 347 Ark. 941, 959, 69 S.W.3d 393, 405 (2002). The person interfering must be a stranger to the contract because a party to a contract cannot be held liable for interference. *Id.*

McDonald's is not a stranger to the contract. The franchise agreements provided that the plaintiffs could not sell the franchises without approval by McDonald's. Hence, McDonald's was a necessary party to the agreement between plaintiffs and Johnson to sell the Jacksonville franchises, not a stranger to the agreement. Every case that this Court has found that has addressed the issue has held that the franchisor is not a stranger to a contract to sell the franchise and therefore cannot be liable for tortious interference with a contract to sell the franchise. *Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260 F.3d 1285, 1294 (11th Cir. 2001); *Childers Oil Co., Inc. v. Exxon Corp.,* 960 F.2d 1265, 1269, 1271 (4th Cir. 1992); *McDonald's Corp. v. Turner-James,* No. 05–804, slip op. at 12 (E.D.Va. Nov. 29, 2005); *Brock v. Baskin Robbins, USA, Co.,* No. 5:99–CV–274, 2003 WL 21309428, at *7 (E.D.Tex. Jan. 17, 2003); *Stephenson v. Allstate Ins. Co.,* 141 F.Supp.2d 784, 795 (E.D.Mich.2001); *Home Repair, Inc. v. Paul W. Davis Sys., Inc.,* No. 98 C 4074, 1998 WL 721099, at *4–5 (N.D.Ill. Oct. 9, 1998); *Cook v. Little Caesar Enter., Inc.,* 972 F.Supp. 400, 415 (E.D.Mich.1997), *aff'd,* 210 F.3d 653 (6th Cir.2000); *City & Suburban Dist.-Ill., Inc. v. Stroh Brewery Co.,* No. 87 C 1409, 1996

WL 251431, at *2 (N.D.Ill. May 8, 1996); *Allied Dist., Inc. v. Latrobe Brewing Co.,* 847 F.Supp. 376, 377, 379 (E.D.N.C.1993); *Nobel Lodging, Inc. v. Holiday Hospitality Franchising, Inc.,* 249 Ga.App. 497, 500, 548 S.E.2d 481, 484 (2001); *Genet Co. v. Annheuser–Busch, Inc.,* 498 So.2d 683, 684 (Fla.Dist.Ct.App.1986); *Noller v. GMC Truck & Coach Div., GM Corp.,* 244 Kan. 612, 620, 772 P.2d 271, 277 (1989); *R.A., Inc. v. Anheuser–Busch, Inc.,* 556 N.W.2d 567, 571–72 (Minn.App.1996); *Tynan v. GM Corp.,* 248 N.J.Super. 654, 670–72, 591 A.2d 1024, 1033–34 (1991), *rev'd on other grounds,* 127 N.J. 269, 604 A.2d 99 (1992); *Morse v. Ted Cadillac, Inc.,* 146 A.D.2d 756, 757, 537 N.Y.S.2d 239, 240 (1989). Although the Arkansas Supreme Court has not addressed this precise issue, I predict that the Arkansas Supreme Court would follow this long line of authority. *Cf. Pace Const. Co. v. U.S. Fid. & Guar. Co.,* 934 F.2d 177, 179 (8th Cir.1991) (predicting how the Missouri Supreme Court would rule in the absence of controlling authority). Because the plaintiffs cannot make out an essential element of a tortious interference claim, Count I is dismissed with prejudice.

### IV.

■ McDonald's argues that Count III of the complaint should be dismissed because the AFPA does not apply in this case. Section 4–72–203 of the Arkansas Code states:

> [T]he provisions of this subchapter [the AFPA] shall not apply to those business relations, actions, transactions, or franchises ... which are subject to the Federal Trade Commission regulations, "Disclosure Requirements and Prohibitions Concerning Franchising and Busi-

ness Opportunity Ventures", 16 C.F.R. 436.1 et seq.

The FTC regulations apply to the "advertising, offering, licensing, contracting, sale or other promotion in or affecting commerce"[1] of any "franchise." 16 C.F.R. § 436.1. The regulations define "franchise" as follows:

> (a) The term franchise means any continuing commercial relationship created by any arrangement or arrangements whereby:
>
> (1) (i)(A) a person (hereinafter "franchisee") offers, sells, or distributes to any person other than a "franchisor" (as hereinafter defined), goods, commodities, or services which are:
>
>> (1) Identified by a trademark, service mark, trade name, advertising or other commercial symbol designating another person (hereinafter "franchisor"); or
>>
>> (2) Indirectly or directly required or advised to meet the quality standards prescribed by another person (hereinafter "franchisor") where the franchisee operates under a name using the trademark, service mark, trade name, advertising or other commercial symbol designating the franchisor; and
>
> (B)(1) The franchisor exerts or has authority to exert a significant degree of control over the franchisee's method of operation, including but not limited to, the franchisee's business organization, promotional activities, management, marketing plan or business affairs; or
>
>> (2) The franchisor gives significant assistance to the franchisee in the latter's method of opera-

---

**1.** The FTCA defines "commerce" as "commerce among the several States or with for-

eign nations." 15 U.S.C. § 44.

tion, including, but not limited to, the franchisee's business organization, management, marketing plan, promotional activities, or business affairs; *Provided, however,* That assistance in the franchisee's promotional activities shall not, in the absence of assistance in other areas of the franchisee's method of operation, constitute significant assistance . . .

.    .    .    .    .

(2) The franchisee is required as a condition of obtaining or commencing the franchise operation to make a payment or a commitment to pay to the franchisor, or to a person affiliated with the franchisor.

(3) Exemptions. The provisions of this part shall not apply to a franchise:

.    .    .    .    .

█ (iii) Where the total of the payments referred to in paragraph (a)(2) of this section made during a period from any time before to within 6 months after commencing operation of the franchisee's business, is less than $500 . . . .

*Id.* § 436.2. To be subject to the federal regulations, then, a franchise must meet the following three requirements: (1) the franchisee must offer, sell, or distribute goods or services that bear the franchisor's trademark, trade name, advertising or other commercial symbol; (2) the franchisor must exert or have the right to exert significant control over the franchisee's method of operation, or the franchisor must promise to provide the franchisee significant assistance in the franchisee's operation; and (3) as a condition to obtain or begin the franchise relationship, the

franchisee must pay or commit to pay at least $500 to the franchisor or the franchisor's affiliate at any time before or within six months after the franchise business begins. *FTC v. Nat'l Bus. Consultants, Inc.,* 781 F.Supp. 1136, 1151–52 (E.D.La. 1991).

█ The franchise agreements show that the two McDonald's franchises were subject to the federal regulations.[2] The agreements are contracts "in or affecting commerce." They grant the right "to adopt and use . . . the trade names, trademarks and service marks" of McDonald's "in connection with the sale of those food and beverage products which have been designated by McDonald's at the Restaurant." And they show that the plaintiffs were required to pay a fee of $22,500 per franchise in consideration for the initial grant of the franchises.

Furthermore, provisions demonstrating both McDonald's "significant degree of control over" and "significant assistance to" the plaintiffs' operations pervade the franchise agreements. The franchise agreements provide that the restaurants would "be operated in conformity to the McDonald's System through strict adherence to McDonald's standards and policies." According to the agreements, the McDonald's System requires the plaintiffs to:

(a) Operate the Restaurant in a clean, wholesome manner in compliance with prescribed standards of Quality, Service, and Cleanliness; comply with all business policies, practices, and procedures imposed by McDonald's; serve at the Restaurant only those food and beverage prod-

---

**2.** Plaintiffs argue that the franchise agreements are hearsay and cannot be relied on to show that the franchises are subject to the federal regulations. The franchise agreements, however, do not fall under the hearsay

rule because they are verbal acts. *See Mueller v. Abdnor,* 972 F.2d 931, 937 (8th Cir.1992) ("A contract . . . is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay.").

ucts now or hereafter designated by McDonald's; and maintain the building, equipment, seating and decor and parking area, in a good, clean, wholesome condition and repair, and well lighted and in compliance with designated standards as may be prescribed from time to time by McDonald's;

(b) Purchase kitchen fixtures, lighting and other equipment, seating, and signs in accordance with the equipment specifications and layout initially designated by McDonald's, and, promptly after notice from McDonald's that the Restaurant premises are ready for occupancy, cause the installation thereof;

(c) Keep the Restaurant constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System or as such blueprints and plans may be reasonably changed from time to time by McDonald's;

(d) [N]ot, without the prior written consent of McDonald's: (i) make any building design conversion, or (ii) make any alterations, conversions, or additions to the building, equipment or parking area;

(e) Make repairs or replacements required because of damage, wear and tear, or in order to maintain the Restaurant building and parking area in good condition and in conformity to blueprints and plans;

(f) Where parking is provided, maintain the parking area for the exclusive use of Restaurant customers;

(g) Operate the Restaurant seven days per week throughout the year and at least during the hours from 7:00 a.m. to 11:00 p.m., or such other hours as may from time to time be prescribed by McDonald's (except when the Restaurant is untenable as a result of fire or other casualty), maintain sufficient supplies of food and paper products, and employ adequate personnel so as to operate the Restaurant at its maximum capacity and efficiency;

(h) Cause all employees of Licensee, while working in the Restaurant, to: (i) wear uniforms of such color, design and other specification as McDonald's may designate from time to time, (ii) present a neat and clean appearance, and (iii) render competent and courteous service to Restaurant customers;

(i) In the dispensing and sale of food products: (i) use only containers, cartons, bags, napkins and other paper goods and packaging bearing the approved trademarks and which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; (ii) use only those flavorings, garnishments and food and beverage ingredients which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; and (iii) employ only those methods of food handling and preparation which McDonald's may designate from time to time;

(j) To make prompt payment in accordance with the terms of invoices rendered to Licensee on his purchase of fixtures, signs, equipment and food and paper supplies;

(k) At his own expense, comply with all federal, state and local laws, ordinances and regulations affecting the operation of the Restaurant.

The agreements give McDonald's the right to inspect the restaurants at all reasonable times to ensure that the plain-

tiffs are operating them in compliance with the standards and policies of the McDonald's System. The agreements state that McDonald's, in turn, is to communicate to the plaintiffs "know-how, new developments, techniques and improvements in areas of restaurant management, food preparation, and service." They also state that McDonald's is to provide plaintiffs with business manuals containing detailed information, including "(a) required operations procedures; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies; and (e) other management, advertising, and personnel policies." The agreements require the plaintiffs to use these manuals, and McDonald's has the right under the agreements to modify them "from time to time." Moreover, the agreements contain several financial reporting obligations that the plaintiffs have to McDonald's:

> On or before the 1st and 16th day of each month, Licensee shall render to McDonald's a statement, in such form as McDonald's shall reasonably require from time to time, of all receipts from the operation of the Restaurant for the respective preceding half-month periods immediately ended. On or before the twenty-fifth (25th) day of each month Licensee shall submit to McDonald's an operating statement and a statistical report for the previous month in form satisfactory to McDonald's. Licensee shall keep and preserve full and complete records of Gross Sales for at least three years in a manner and form satisfactory to McDonald's and shall also deliver such additional financial, operating and other information and reports as McDonald's may reasonably request on the forms and in the manner prescribed by McDonald's. Licensee further agrees to submit within ninety (90) days following the close of each fiscal year of his Restaurant's operation, a profit and loss statement covering operations during such fiscal year and a balance sheet taken as of the close of such fiscal year. . . .

In addition, the agreements give McDonald's the right to both inspect and audit the plaintiffs' accounts, books, records, and tax returns at any reasonable time to insure that the plaintiffs are complying with the terms of the franchise agreements. The agreements require McDonald's to "make available to Licensee the services of Hamburger University," while requiring the plaintiffs, in return, to enroll their managers, "present and future, at Hamburger University or at such other training center as may be designated by McDonald's from time to time."

The provisions of the franchise agreements leave no doubt that the franchises are subject to the federal regulations. Because the franchises are therefore excluded from the coverage of the AFPA, Count III is dismissed with prejudice.

## CONCLUSION

McDonald's motion to dismiss Counts I and III in the plaintiffs' complaint is GRANTED. Docket # 5. The plaintiffs' claims for tortious interference and violation of the AFPA are dismissed with prejudice.